UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLANIA

CASE NO.: _____

ISABELLA KOWALSKI, a Pennsylvania
resident, individually and on behalf of all
others similarly situated,

    Plaintiff,

v.

TIKTOK INC., a California corporation, and
BYTEDANCE INC., a Delaware corporation,

    Defendants.
_____/

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Isabella Kowalski ("Ms. Kowalski" or "Plaintiff") brings this class action against Defendants TikTok Inc. ("TikTok") and ByteDance Inc. ("ByteDance") (collectively, "Defendants"), and alleges, based upon personal knowledge as to herself and her own acts and experiences, and on information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, as follows:

## INTRODUCTION

1.  This is a class action brought by a Pennsylvania citizen against the U.S.-based corporations Tik Tok and ByteDance (which were and are controlled and largely owned by the same individual in China, Yiming Zhang), for intercepting the electronic communications of users of the TikTok app when they link to third-party websites in the TikTok app. Defendants employ JavaScript computer code ("Session Replay Code") to track users' every move as they browse the Internet from within the TikTok app. As users browse a third-party website from within the

TikTok app, they do so via TikTok's in-app web browser (with no option to use the mobile phone's default web browser), and the Session Replay Code intercepts and records the user's electronic communications, including their keystrokes, clicks, scrolling and swiping finger movements, text being entered into an information field or text box (even when never sent to the website), and/or other electronic communications as they occur in real time ("Website Communications").

2. Session Replay Code goes far beyond the expectations of ordinary users of the Internet of the data they might be offering to companies. According to a Princeton University study: "The extent of the data collected 'far exceeds user expectations,' including recording what you type into a text box before you submit it, 'all without any visual indication to the user.'"[1]

3. Moreover, the use of Session Replay Code is not tolerated by some of the largest tech companies. In 2019, Apple warned app developers using Session Replay Code that they were required to disclose this type of tracking and recording to their users, or they would be immediately removed from the Apple Store. "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[2]

4. Defendants' conduct directly violates the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701 *et. seq*. ("WESCA" or the "Act"), which was passed by the Pennsylvania General Assembly to bar the interception and recording of private communications without prior consent of all parties to the conversation. *See Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022).

---

[1] Nitasha Tiku, "The Dark Side of 'Replay Sessions' That Record Your Every Move Online," *Wired*, available at https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/ (last visited Dec. 12, 2022).
[2] https://techcrunch.com/2019/02/07/apple-glassbox-apps/ (last visited Dec. 12, 2022).

5.      Plaintiff brings this action individually and on behalf of a class of all Pennsylvania citizens whose Website Communications were intercepted through Defendants' use of Session Replay Code in the TikTok app via TikTok's in-app web browser and seek all civil remedies provided under the cause of action, including but not limited to actual, liquidated, and/or punitive damages, and attorneys' fees and costs.

## PARTIES

6.      Plaintiff is, and at all times relevant hereto was, a natural person and a permanent resident of the state of Pennsylvania.  She is 19 years old, and has resided in Warrington, Pennsylvania her entire life.  Ms. Kowalski has had the TikTop app downloaded on her iPhone since 2018, and had its predecessor the Musical.ly app downloaded starting in about 2016.  Over the past two years, Ms. Kowalski used the TikTok app almost every day, and regularly uses it two or more times in a single day.  At least once a week and often more, while using the TikTok app, Ms. Kowalski clicks on links to external, third-party websites causing her to use TikTok's in-app web browser.  In November 2022, Ms. Kowalski visited www.ilmakiage.com, the website of a makeup and cosmetics company, via the TikTok app, from her home in Warrington, Pennsylvania, and input personal information on that website in order to purchase a product from that company.

7.      Defendant TikTok is, and at all times relevant hereto was, a corporation organized and validly existing under the laws of California with its principal place of business in Culver City, California.  It is a wholly owned subsidiary of TikTok, LLC.

8.      Defendant ByteDance is, and at all times relevant hereto was, a corporation organized and validly existing under the laws of Delaware with its principal place of business in Mountain View, California.  Upon information and belief, ByteDance is involved in development of the TikTok app, including research and development of software for the TikTok app.

9. At all relevant times, Defendants have shared offices in Silicon Valley and at 5800 Bristol Parkway, Culver City, California, and have also shared employees. Employees frequently have both a TikTok and a ByteDance email address, and executives often have roles at both companies. For example, in April 2021, it was announced that Shou Zi Chew, the CFO of ByteDance, would concurrently take on the role of CEO of TikTok.[3] TikTok's "Head of HR, Americas & Global Functions, GBS," Kate Barney, is apparently also ByteDance's "Head of HR, US & Europe, Monetization."[4]

10. The ByteDance US Applicant Privacy Notice provided to prospective employees represents Defendants as a single entity: "ByteDance ('we' or 'us') has prepare this Applicant Privacy Notice ('Notice') for applicants to roles with ByteDance . . . references to 'ByteDance' comprises the following U.S. entities: ByteDance Inc., TikTok Inc., and any US incorporate affiliates."[5]

11. On information and belief, Defendants do not operate as independent corporate entities, but instead function as satellite offices of the China-headquartered company Beijing Douyin Information Service Co. Ltd. a/k/a ByteDance Technology Co. Ltd. ("Beijing ByteDance"). Defendants operate with little independence and are constantly monitored by Chinese management.

12. On information and belief, Beijing ByteDance makes key strategic decisions for Defendants, including regarding the TikTok app, and Defendants are tasked with executing such decisions. Beijing ByteDance's level of involvement is in TikTok's operations has been described

---

[3] Molly Schuetz, *ByteDance's Shouzi Chew Named New TikTok CEO*, FORTUNE (Apr. 30, 2021), available at https://fortune.com/2021/04/30/new-tiktok-ceo-bytedance-shouzi-chew/.
[4] https://www.linkedin.com/in/katemcfarlinbarney/ (last visited Dec. 12, 2022).
[5] *ByteDance US Applicant Privacy Notice*, available at https://sf16-sg.tiktokcdn.com/obj/eden-sg/ha_lm_lswvlw/ljhwZthlaukjlkulzlp/portal/static/ByteDance_US_Applicant_Privacy_Notice.pdf   (last visited Dec. 12, 2022).

by former employees as "so blurry as to be non-existent."[6]  Moreover, U.S. employees of Defendants in California are expected to work during Chinese business hours to be available to Beijing-based employees Beijing ByteDance.[7]  For example, one former project manager who posted a YouTube video entitled "Why I Just Quit My Product Manager Job at TikTok" stated she was expected to regularly attend late-night "Beijing meetings," and to submit a last-minute product proposal regarding the TikTop app for approval to the "Beijing team," even after it had already been approved by U.S. management.[8]

13. The close relationship between Beijing ByteDance and Defendants encompasses the former's ready access to any and all of U.S. users' data acquired through their use of the TikTok app.[9]

14. At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of the other Defendant, and each Defendant acted in the course and scope of such agency, partnership and/or in furtherance of such joint venture.  Each Defendant acted with the knowledge and consent of the other Defendant and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted and/or participated in the acts or transactions of the other Defendant.

15. At all relevant times, and in connection with the matters alleged herein, Defendants were controlled and largely owned by the same person, China-based founder Zhang Yiming, and constitute a single enterprise with a unity of interest.

---

[6] Salvador Rodriguez, *TikTok Insiders Say Social Media Company is Tightly Controlled by Chinese Parent ByteDance*, CNBC (June 25, 2021), available at https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.
[7] ByteDance, *LinkedIn Interviews ByteDance: How ByteDance Builds Its Global Employer Brand*, YOUTUBE, https://www.youtube.com/watch?v=Epp_TN52fSU.
[8] Chloe Shih, *Why I Just Quit My Product Manager Job at TikTok*, YOUTUBE, https://www.youtube.com/watch?v=pkDXV2g_i7Y.
[9] *See id.*

## JURISDICTION AND VENUE

16. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the members of the putative class are of diverse citizenship from Defendants, there are more than 100 members of the putative class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

17. The Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of conducting business in the state of Pennsylvania, by providing its online services in Pennsylvania and collecting real-time data from website visit sessions initiated by Pennsylvania residents while they were in Pennsylvania. The privacy violations alleged herein resulted from these purposeful and tortious acts directed by Defendants towards users of the TikTok app even if they are citizens of Pennsylvania and accessing the websites from within Pennsylvania.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claim occurred in this District. Moreover, Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

19. Pennsylvania, along with at least nine other U.S. states, is a "two-party consent" state, *i.e.*, a jurisdiction in which all parties to a conversation must consent to the recording of the conversation.

20. Consistent with this, Pennsylvania's WESCA bars the surreptitious interception and recording of private communications. 18 Pa. Cons. Stat. §§ 5702-03.

21. The TikTop app debuted in the United States in September 2018 (as a successor to the Musical.ly app after ByteDance purchased Musical.ly, Inc.). One month thereafter, it had

surpassed Facebook, Instagram, YouTube, and SnapChat in monthly installations, and had more than one billion downloads.[10] In 2020, the year of the COVID-19 lockdowns, it was the second most downloaded iPhone app.[11] In 2021, it was the most popular app in the United States,[12] and had 1.2 billion active users globally in the fourth quarter of that year.[13]

22. While TikTok is most widely known for user-created dance, comedy, or lip-synching videos, the variety of content that can be created and viewed on TikTok is virtually limitless—if you can imagine it, it likely exists on TikTok. The content on the TikTop app is aimed at perpetuating its users' dopamine (*i.e.*, the neurotransmitter released in the brain to give a sense of reward or accomplishment), typically with videos less than one minute long. Just as with a slot machine at a casino, users can find themselves scrolling the TikTop app for hours without realizing it, awash in a dopamine rush.

23. TikTok touts that one in every two "Gen Z" (*i.e.*, the generation aged 18 to 25 as of the date of this filing) TikTok users are likely to purchase a product while using TikTok; that 81% of users use TikTok to discover new products and brands; and that TikTok video ads take up six times more space on the user's screen than traditional "banner ads."[14] In the second quarter of 2021, consumers spent over $500 million in purchases via the TikTok app.[15] One independent study of TikTok's effectiveness for advertisers by consumer insights platform Disqo found that

---

[10] Dan Hughes, *The Rapid Rise of TikTok*, Digital Marketing Institute (Aug. 26, 2019), https://digitalmarketinginstitute.com/blog/the-rapid-rise-of-tiktok (last visited Dec. 12, 2022).
[11] Werner Geyser, *TikTok Statistics—63 TikTok Stats You Need to Know [2022 Update]*, Influencer Marketing Hub (updated Aug. 1, 2022), https://influencermarketinghub.com/tiktok-stats/ (last visited Dec. 12, 2022).
[12] *Id*.
[13] Mansoor Iqbal, *TikTok Revenue and Usage Statistics (2022),* Business of Apps (Nov. 11, 2022), https://www.businessofapps.com/data/tik-tok-statistics/#:~:text=TikTok%20generated%20an%20estimated%20%244.6%20billion%20revenue%20in,Is%20accessed%20by%20over%20600%20million%20users%20daily (last visited Dec. 12, 2022).
[14] *Get Your Business Discovered on TikTok,* TikTok for Business, https://getstarted.tiktok.com/us-en-v1brand?lang=en&msclkid=9808304b00701c6f2f13532624807b5c (last visited Dec. 12, 2022).
[15] Geyser, *supra* at n.11.

"TikTok users put an average of 8.5% more dollars into their shopping carts" than consumers shopping at those same websites who did not link from TikTok.[16]

24. In 2021, TikTok generated an estimated $4.6 billion in revenue.[17] The United States is TikTok's largest market outside of China.[18]

25. As stated in a 2017 feature story in *The Economist*, the "world's most valuable resource is no longer oil, but data."[19]

26. TikTok's algorithm, the machine learning software tool used to determine what videos and what advertisements to display on a user's home page or a user's "discover page," utilizes tracking software to understand a user's interests and habits.[20] This type of accurate targeted advertising, and the big data that powers it, is critical to Defendants' lucrative marketing business model.

27. To drive its business, TikTok presents users with links to third-party websites in two main ways:

    (a) through TikTok video advertisements, which appear as normal TikTok videos except that they contain icons identifying them as a sponsored post or an advertisement, and which present users with multiple opportunities to link to a third-party website, *e.g.*, to purchase the advertised product; and

---

[16] Liu, Ivy, *TikTok's Latest Good News: Its Ads Are Sticky and Rich People Spend a Lot of Time There*, Digday (Sept. 30, 2021), https://digiday.com/media/tiktoks-latest-good-news-its-ads-are-sticky-and-effective-and-rich-people-spend-a-lot-of-time-there/ (last visited Dec. 12, 2022).
[17] Mansoor, *supra* at n.13.
[18] *Id*.
[19] *The world's most valuable resource is no longer oil, but data*, The Economist (May 6, 2017), available at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.
[20] *See, e.g.*, *How TikTok's Algorithm Works: A Fascinating and Disturbing Analysis,* 9 to 5 Mac (July 28, 2021), https://9to5mac.com/2021/07/28/how-tiktoks-algorithm-works/.

  (b)  through the profiles of users with more than 1,000 followers, including popular TikTok personalities, businesses or organizations, which have the option to add a link to external websites directly on their profile.

28. In both scenarios, the third-party website is opened via TikTok's in-app browser. Specifically, while a user attempts to access a website by clicking a link while using the TikTok app, the website does not open via the user's default web browser on the mobile device, such as Safari or Google Chrome. Instead, unbeknownst to the user, and without offering the user any option, the link is opened inside the TikTop app, in Defendants' own in-app browser. Thus, the user views the third-party website without leaving the TikTok app.

29. TikTok's in-app browser inserts JavaScript Session Replay Code into the third-party websites that are accessed using the in-app browser. The inserted code intercepts all the details of the TikTok user's use of the in-app browser while it is open, and TikTok tracks and captures all these details as the user interacts with the website.

30. Software researcher and blogger Felix Krause recently published a report on the risks of in-app Internet browsers.[21] Of the seven popular apps Krause tested, TikTok was the only app that monitors keystrokes.

31. Specifically, while a user is interacting with the third-party website, TikTok tracks and records all keyboard inputs. It also records every tap on any button, link, image or other website element and logs details about what that element is.[22]

32. Krause created and used a tool called InAppBrowser.com to detect JavaScript commands executed. Krause concluded that "TikTok injects code into third party websites

---

[21] *See* Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, krausfx.com (Aug. 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track-anything-you-do-on-any-website-in-their-in-app-browser (last visited Dec. 12, 2022).
[22] *Id*.

through their in-app browsers that behaves like a keylogger."[23]  Anything that user does via TikTok's in-app browser is recorded and stored by Defendants, including what links were clicked, what form fields were filled out (and with what text), how the user scrolled or manipulated images using various finger movements, and what images were viewed.  The graphics below show the JavaScript code inserted by Defendants' in-app browser into the Apple iOS operating system and the tool's description of the function of the code.  Plaintiff is informed and believes that similar JavaScript Session Replay Code is inserted by Defendants' in-app browser into the Android operating system.

```
                                    /* -------------------
                                          DISCLAIMER:

               The code below was generated through https://inappbrowser.com
            which basically overrides many of the standard JavaScript functions to get alerted
            whenever the host iOS app runs JavaScript commands. The code below is not complete.
             For example, having "[object HTMLStyleElement]" would mean an object, of the type
                HTMLStyleElement is being used. However, there are no further insights on those.

                    Also, there might be more JavaScript code that is being run, through
                 https://developer.apple.com/documentation/webkit/wkcontentworld, which can't be detected
                                           by this tool.

             The code below is for educational purposes only, and does not reflect a 100% accurate
                           representation of the JavaScript code that is being run.

                                   This file was generated on 2022-08-17
                                                    */


                                    HTMLDocument.createElement('style')

                                     [object HTMLStyleElement].type = 'text/css'
        [object HTMLStyleElement].innerText = 'img { -webkit-user-select: none; -webkit-touch-callout: none; }'
                                   HTMLDocument.getElementsByTagName('head')
                                            [object HTMLCollection]['0']
                                        window.removeEventListener('error')
                                   window.removeEventListener('unhandledrejection')
                              window.addEventListener('unload', function () { [native code] }
                              window.addEventListener('unload', function () { [native code] }

                     HTMLDocument.addEventListener('click', function (n){u=void 0,n&&e!==n&&r({event:e=n,name:t})})

                   HTMLDocument.addEventListener('keypress', function (n){var t;try{t=n.target}catch(n){return}var
       r=t&&t.tagName;r&&("INPUT"===r||"TEXTAREA"===r||t.isContentEditable)&&(u||i("input",e)(n),clearTimeout(u),u=window.setTimeout
                                           (function(){u=void 0},o)})})

                         window.addEventListener('error', function (n){n=t(n),n=n&&i(n);n&&r&&r(n)}
                   window.addEventListener('unhandledrejection', function (n){n=t(n),n=n&&i(n);n&&r&&r(n)}
                      window.addEventListener('error', function (n){n=mt(e(),n,u||""");n&&t&&t(n)}, true
                  window.addEventListener('keydown', function (){t&&t({name:"LCPMonitor",lcp:e}),i()}, true

                      window.addEventListener('click', function (){t&&t({name:"LCPMonitor",lcp:e}),i()}, true

         window.addEventListener('unload', function (){o(),Yn.forEach(function(n){window.removeEventListener(n,u,!0)})}
       window.addEventListener('beforeunload', function (){o(),Yn.forEach(function(n){window.removeEventListener(n,u,!0)})}
           window.addEventListener('pagehide', function (){o(),Yn.forEach(function(n){window.removeEventListener(n,u,!0)})}
          HTMLDocument.addEventListener('visibilitychange', function (n){w(r)?r(n):"hidden"===document.visibilityState&&t(n)})
                          window.addEventListener('unload', function (){o&&!b()&&(A(!0),r&&r())}
                       window.addEventListener('beforeunload', function (){o&&!b()&&(A(!0),r&&r())}
                         window.addEventListener('pagehide', function (){o&&!b()&&(A(!0),r&&r())}
          HTMLDocument.addEventListener('visibilitychange', function (n){w(r)?r(n):"hidden"===document.visibilityState&&t(n)})
                                  window.addEventListener('error', function (n){var
      t,r=n||o.event||{};try{t=r.target||r.srcElement||{}}catch(r){return}(w((n=t).getAttribute?n.getAttribute("integrity"):n.inte
           grity)&&(n=w((n=t).getAttribute?n.getAttribute("src"):n.src||n.href||"",t=(null===(t=t.tagName)||void 0===t?void
                              0:t.toLowerCase())||"",n&&t&&n!==location.href&&e(n))}, true
                                     HTMLDocument.querySelector('head > title')
```

---

[23] *Id*.




24

33. When a purchase is made via TikTop's in-app browser, Defendants automatically intercept all the details of the purchase entered by the user, including the name of the purchaser, their address, telephone number, credit card or bank information, usernames, passwords, dates of birth, and other personal information.

---

[24] *Id*.

34. Moreover, in the case of many other types of websites, the Session Replay Code in TikTok's in-app browser enables Defendants to obtain valuable, but undeniably private, information, such as about a user's mental health, physical health, or sexual preferences. For example, the online talk therapy company BetterHelp has a verified account on the TikTok app with a link to its website, which immediately asks the website visitor questions about their mental health needs. Knowing which pages a user chooses to click on and spends time reading (a click without time spent scrolling on the text would be distinguishable as a mere mistake by the user) can reveal deeply personal and private information, which TikTok intercepts to monetize by sending more accurate targeted content and advertisements to the user. Other third-party websites that users can link to via the TikTok app connect users with doctors or mental health professionals, and the information entered by the user to be placed with the appropriate professional is also tracked via the TikTok app unbeknownst to the website user.

35. In an endlessly reinforcing feedback loop staring with the TikTok app, moving to third-party websites that reveal a plethora of data about the user, and then returning back to the TikTok app now better informed to feed the user targeted content (*i.e.*, to connect the user with advertisers), Defendants have a data-driven business model unprecedented in scope that directly violates the privacy rights of Pennsylvanians.

36. Defendants have specifically targeted consumers in Pennsylvania with advertising campaigns that appeared on television in Pennsylvania promoting the TikTok app.[25]

---

[25] *See* Sam Bradley, *TikTok on TV: What Does the Social Media Platform's Ad Spend Tell Us?*, thedrum.com (Apr. 27, 2021), https://www.thedrum.com/news/2021/04/27/tiktok-tv-what-does-the-social-video-platform-s-ad-spend-tell-us; Todd Spangler, *TikTok Launches Biggest-Ever Ad Campaign as Its Fate Remains Cloudy*, VARIETY (Aug. 18, 2020), https://variety.com/2020/digital/news/tiktok-advertising-brand-campaign-sale-bytedance-1234738607/ (both last visited Dec. 12, 2022).

37. Defendants embed computer code on the TikTop app that acts to intercept the Website Communications of a Pennsylvania citizen using the TikTop app who links to a third-party website via TikTok's in-app browser.

38. After intercepting and capturing the Website Communications, Defendants use those Website Communications to recreate the Pennsylvania citizen's entire visit to the websites. Defendants create and save video replay of the user's behavior on the website for analysis. This is the electronic equivalent of "looking over the shoulder" of each visitor to the websites for the entire duration of their website interaction.

39. The wiretaps engage as soon as the user clicks on a link in the TikTok app to a third-party website launching TikTok's in-app browser. Therefore, users are not provided with an opportunity to review any privacy policies or disclosures regarding deployment of the wiretaps on the third-party websites.

40. The Session Replay technology used by Defendants is not a cookie, tag, web beacon, or analytics tool. Unlike website analytics services that provide aggregate statistics, Session Replay is intended to record and play back the entirety of an individual's browsing session.

41. Defendants' actions through TikTok's in-app browser are not part of routine Internet functionality. As standard web browsers on mobile phones (*e.g.*, Google Chrome, Apple's Safari) do not record users with Session Replay Code, even the companies that created and host the third-party websites to which TikTok users link are unaware that these visitors to their websites are recorded by Defendants using Session Replay Code. Surreptitious interception and recording of a user's keystrokes, clicks, swipes, and text communications are contrary to the legitimate expectation of TikTok users in Pennsylvania browsing the web via the TikTok app, and contrary to established industry norms.

42. Defendants maintain the records of users they have wiretapped, either through their own computer systems or through a third-party contractor.

43. As an example of Defendants' unlawful conduct, in November 2022, Plaintiff visited www.ilmakiage.com, the website of a makeup and cosmetics company, via the TikTok app from her home in Warrington, Pennsylvania, and input personal information in order to purchase a product from that company. Unbeknownst to her, Defendants engaged Session Replay Code to record and store the personal information she entered.

44. Plaintiff and other similarly situated TikTok users had no knowledge of, and did not give prior consent for, Session Replay Code recording her Website Communications on third-party websites she linked to from the TikTok App. Defendants never asked Plaintiff or similarly situated TikTok users for permission to intercept and record her visits to third-party websites while using TikTok's in-app browser. Nevertheless, upon information and belief, the Session Replay Code that Defendants embedded into the TikTop app intercepted Plaintiff and similarly situated TikTok users' Website Communications. These intercepted Website Communications were then stored by Defendants or its third-party contractor to be replayed later and used for Defendants' financial benefit.

45. At no point did Defendants inform Plaintiff or similarly situated TikTok users in Pennsylvania of their surreptitious recording of her Website Communications as they browsed third-party websites while using the TikTok app.

## CLASS ALLEGATIONS

46. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

All natural persons who, while citizens in the state of Pennsylvania, had their Website Communications captured in Pennsylvania through Session Replay Code activated by the TikTop App at any point during the preceding two years.

47. Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

48. **Numerosity:** The Class members are so numerous that individual joinder of all Class members is impracticable. Upon information and belief, the Class exceeds 100,000 persons. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

49. **Commonality:** There are numerous questions of law and fact common to the Class, including but not limited to:

    a. Whether Defendants violated WESCA;

    b. Whether Defendants intercepted Plaintiff's and the Class members' electronic Website Communications;

    c. Whether Defendants secured prior consent before intercepting Plaintiff's and the Class members' Website Communications; and

    d. Whether Defendants are liable for damages, and the amount of such damages.

50. **Typicality:** Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

51.     **Adequacy of Representation:** Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel.

52.     **Superiority:** In this lawsuit, a class action is superior to all other available methods for its fair and efficient adjudication because individual litigation of the claims of all Class members is economically infeasible and procedurally impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

53.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. If Defendants intercepted Plaintiff's and Class members' communications, then Plaintiff and each Class member suffered damages by that conduct.

## CAUSE OF ACTION

### COUNT I
### Violation of the Pennsylvania Wiretap and Electronic Surveillance Control Act
### (18 Pa. Cons. Stat. § 5701 *et seq.*)

54.     Plaintiff re-alleges and incorporates paragraphs 1 through 53 as if fully set forth herein.

55.     Plaintiff brings this claim individually and on behalf of the Class.

56.     WESCA prohibits the intentional (1) interception, endeavoring to intercept, or procurement of any other person to intercept or endeavoring to intercept "any wire, electronic or

oral communication;" (2) disclosure or endeavoring to disclose to any other person the contents of "any wire, electronic or oral communication, or evidence derived therefrom," knowing or having reason to know that the information was obtained through such interception; and (3) using or endeavoring to use the contents of "any wire, electronic or oral communication, or evidence derived therefrom," knowing or having reason to know the information was obtained through such interception. 18 Pa. Cons. Stat. § 5703.

57. A civil action for damages under the Act can be brought against "any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use" a "wire, electronic, or oral communication" in violation of the Act for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and costs. 18 Pa. Cons. Stat. § 5725(a).

58. The Act defines "intercept" as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." *Id*.

59. "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." *Id*.

60. Defendants, as corporations, are each "persons" under the Act.

61. "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." *Id*.

62. Plaintiff's and the putative Class members' keystrokes, clicks, scrolling and swiping finger movements, text typed, and other interactions with websites via TikTok's in-app browser are "contents" of "electronic communications" under the Act.

63. Session Replay software like that used by Defendants is an "electronic, mechanical or other device" "used to intercept a wire, electronic, or oral communication" under the Act. *See id*.

64. Defendants intentionally employ Session Replay Code to automatically and indiscriminately spy on and intercept website visitors' electronic communications as they take place in real time.

65. Plaintiff's and the Class members' electronic communications were intercepted contemporaneously with their transmission.

66. Plaintiff and the Class members did not give prior consent to having their communications intercepted by Defendants. In fact, Plaintiff and the Class members reasonably expected under the circumstances that their electronic communications would not be intercepted.

67. At all relevant times, Defendants' conduct was knowing and intentional.

68. Pursuant to § 5725(a), Plaintiff and the Class members are each entitled to (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class alleged herein, respectfully request that the Court enter judgment in her favor and against Defendants as follows:

      A.      Certifying the Class under Federal Rule of Civil Procedure 23 and naming Plaintiff as the representative for the Class and Plaintiff's attorneys as Class Counsel;

      B.      Declaring that Defendants' conduct violates WESCA;

      C.      Finding in favor of Plaintiff and the Class members on the claim asserted herein;

      D.      Awarding Plaintiff and the Class members actual damages, liquidated damages, and punitive damages in amounts to be determined by the Court or by the jury at trial;

      E.      Awarding Plaintiff and the Class members pre-judgment and post-judgment interest; and

      F.      Awarding Plaintiff and the Class members their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the putative class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

Dated: December 13, 2022.

Respectfully submitted,

*/s/ Kenneth J. Grunfeld*
Kenneth J. Grunfeld, Esq.
PA Identification No. 84121
**GOLOMB SPIRT GRUNFELD, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19104
kgrunfeld@golomblegal.com


Steven Sukert, Esq.*
Jeff Ostrow, Esq.*
Jonathan M. Streisfeld, Esq.*
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
sukert@kolawyes.com
ostrow@kolawyers.com
streisfeld@kolawyers.com

*pro hac vice to be submitted


*Counsel for Plaintiffs and the Putative Class*